IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,

Plaintiff,

v.

JOSHUA W. RODRIGUEZ,

Defendant.

8:15CR103

MEMORANDUM AND ORDER

This matter is before the court on the defendant's objection, Filing No. 30, to the findings and recommendation of the magistrate judge ("F&R"), Filing No. 26.  After an evidentiary hearing on May 12, 2015, the magistrate judge recommended that the defendant's motion to suppress, Filing No. 13, be denied.  *See* Filing No. 26, F&R; Filing No. 31, Transcript ("Tr.") at 123.

Pursuant to 28 U.S.C. § 636(b)(1)(A), the court has conducted a de novo determination of those portions of the F&R to which the defendant objects.  *United States v. Lothridge*, 324 F.3d 599, 600-01 (8th Cir. 2003).  The court has reviewed the record including the transcript of the hearing, and the exhibits, including a videotaped recording ("video") of the police encounter.  Filing No. 31, Transcript ("Tr."); Filing No. 23, Exhibit List, Hearing Exhibits ("Hr'g Exs.") 1 & 2.

I.      Facts

The facts are stated in the magistrate judge's F&R and will be repeated only as necessary to the court's opinion.  Filing No. 26, F&R (incorporating statements made on the record); Filing No. 31, Tr. at 55-62.  The defendant has been charged with unlawful possession of a machinegun, in violation of 18 U.S.C. §§ 922(o) and 924(a)(2) and with being an unlawful

user and addict in possession of an assault rifle in interstate commerce, in violation of 18 U.S.C. § 922(g)(3). Filing No. 1, Indictment.

An evidentiary hearing was held on May 12, 2015. Filing No. 31, Tr. Nebraska State Patrol Narcotics Investigator Richard Lutter testified that he began an investigation of the defendant after observing potting plants behind a vehicle parked in the driveway, $CO_2$ canisters in the garage, and several 55-gallon plastic barrels on the defendant's property. *Id.* at 11. Based on his experience as a narcotics officer, he believed possession of those items was indicative of a marijuana "grow operation." *Id.* at 11-12. He subpoenaed Omaha Public Power District records and determined that the defendant's house used four times as much electricity as similar houses. *Id.* at 13. He conducted intermittent surveillance and attempted to obtain the defendant's trash, but found the defendant only placed garbage out for pickup just as the trash-pickup vehicles arrived. *Id.* at 14-15. Officer Lutter also testified he surveilled the defendant on his way to work and observed a traffic stop performed by another officer about a week prior to the encounter at issue herein. *Id.* at 15-16. The officer who conducted the traffic stop later told Lutter that the odor of marijuana was detected coming from the defendant's vehicle, but a search did not reveal any contraband in the vehicle or on the defendant's person. *Id.* at 17.

Investigator Lutter also testified that he did a criminal background check on the defendant and found the defendant had been charged with, but not convicted of, possession of less than an ounce of marijuana on two occasions.[1] *Id.* at 13, 49. The defendant had also been convicted of attempted possession of a concealed weapon and with possessing drug paraphernalia. *Id.* at 49. Officer Lutter also testified that he was aware that the defendant had a permit to carry a concealed weapon at the time of the instant encounter. *Id.* at 12.

---

[1] For the first offense of possession of less than an ounce of marijuana, a person is guilty of an infraction, receives a citation, and can be fined three hundred dollars. Neb. Rev. Stat. § 28-146 (13)(a)-(c).

2

On December 18, 2014, Lutter "made arrangements with the individuals that [he] work[ed] with on a regular basis to conduct a 'knock and talk' so that [he] could speak with Mr. Rodriguez in regards to [Lutter's] beliefs [that Rodriguez was conducting a marijuana grow-operation]." *Id.* at 18.  He did not believe he had probable cause to obtain a warrant at that time. *Id.* at 12, 17-18.  He and several other officers went to the defendant's residence.  All wore plain clothes.[2]  *Id.* at 18.  Lutter testified he was "hoping to get inside the residence to smell for [himself]." *Id.* at 20.  He stated that he and Douglas County Deputy Sherriff Wineinger walked onto the defendant's front porch and knocked on the door. *Id.* at 19.  Other officers were nearby. *Id.* at 19.

Lutter testified that the defendant answered the door, stepped outside, and pulled the door shut behind him. *Id.* at 21.  At the point the defendant pulled the door shut, Lutter smelled a slight odor of marijuana. *Id.* at 22.  Lutter advised the defendant that Lutter was a law enforcement officer, and was there to ask him some questions. *Id.*  Lutter testified that he asked the defendant "if we could step in the residence to talk." *Id.*  Lutter acknowledged that the defendant told Lutter "that he wanted to find more -- ask more information or receive more information before he agreed to speak with [Lutter]" and then turned, opened the interior door, "stepped into the residence and [Lutter] stepped in behind him." *Id.* at 23; *see also id.* at 41, 43-44.  Lutter testified that Deputy Wineinger stepped in as well. *Id.* at 23.

Lutter testified that "the minute [he] stepped into the residence, as [he] followed Mr. Rodriguez in, there was a distinct overwhelming odor of marijuana throughout that permeated the entire residence." *Id.*  He then "told the defendant that because of the overwhelming odor of marijuana being present in the residence, I was going to detain him and that we were going to conduct a protective sweep for the protection of myself and the other officers so that we could then proceed forward with the investigation." *Id.* at 50.  Lutter also testified that the defendant

---

[2] An officer wearing a tactical jacket is shown on the video. *See* Hr'g Ex. 2.

nodded and said "okay" when Lutter told him he was being detained.  *Id.* at 50, 52.  Lutter also stated that he believed he had probable cause to obtain a search warrant when he smelled the "overwhelming odor" of marijuana.  *Id.* at 23-24.  He then secured the residence and brought the other officers in to conduct a protective sweep.  *Id.* at 24.  Four officers conducted the sweep.  *Id.*

The defendant asked for a lawyer.  *Id.* at 27.  Lutter also testified that he read the defendant his rights before the defendant asked for a lawyer.  *Id.* at 27.  Lutter stated that his intent at the time was to get consent from the defendant for a search.  *Id.*  Realizing that consent to search would not be forthcoming, Lutter then applied for and obtained a warrant.  *Id.* Officer Lutter testified he was able to obtain the warrant in about an hour and a half.  *Id.*  The two occupants were detained at the house during that time.  *Id.*

Deputy Sheriff Jarrod Wineinger testified he was assisting Investigator Lutter with the investigation of a possible marijuana manufacturing grow in a residence in south Omaha on December 18, 2014.  *Id.* at 65.  He testified he accompanied Lutter to the front door of the residence.  *Id.*  Investigator Lutter rang the doorbell, knocked on the door, and a party appeared.  *Id.*  The person shut the front door and Lutter continued to speak to the party.  *Id.* Wineinger testified he "got a whiff of the odor of marijuana" at that time.  *Id.*  He stated he could not hear the entire conversation with Investigator Lutter, but observed that the defendant turned and walked into the residence and Lutter followed him in.  *Id.* at 67.  Wineinger testified that he smelled an even stronger odor of raw marijuana once inside the house.  *Id.* at 65.  He stated that the only information he had that people inside the house were dangerous was that he knew that one of the individuals had a weapon on him at a traffic stop.  *Id.* at 66.[3]

---

[3] Thomas Meola, Nebraska State Patrol Supervising Sergeant on the commercial interdiction unit, also testified at the hearing and generally corroborated Lutter's and Wineinger's testimony.  *Id.* at 68.  He was sitting in a car 25 yards down the street from the residence, saw Lutter and Wineinger enter the residence, and was later asked by Lutter to help secure the residence.  *Id.* at 68-69.  He stated he was at the residence for only 2

The defendant, Joshua Rodriguez, testified that he did not give the officers permission to either enter or search his house.  *Id.* at 81, 84, 92-93.  He and his wife were the only people in the residence that day, because their son was at school.  *See id.* at 78-79.  He testified he heard a knock on the door and answered it.  *Id.* at 79.  He could see two officers on the front porch and one, in uniform, in front of a window.  *Id.*  He testified that Lutter was holding the screen door open and when Rodriquez tried to pull it shut Officer Lutter would not allow him to do that by putting himself in the way of the screen door.  *Id.* at 80-81.

He stated that three officers followed him into his house after he turned away from them and took two steps into his house.  *Id.* at 82.  Officer Lutter told him the officers were going to detain him and do a sweep search of the house based on the odor of marijuana and the defendant nodded "Okay."  *Id.* at 84.  He testified he did not put up any resistance because he "found it unwise to argue with law enforcement."  *Id.* at 84.  He testified that he grew marijuana plants for his own consumption.  *Id.* at 88-89.  He also testified he had never been convicted of a felony. *Id.* at 78.

Lutter also testified that the encounter was recorded on "body cam" video cameras mounted on Lutter and on Sergeant Thomas Meola.  *Id.* at 28.  The videos and search warrant application and affidavit were admitted into evidence for purposes of the hearing.  *Id.* at 28; Filing No. 23, Exhibit List, Exs. 1 & 2.  The court has reviewed the evidence, including the videos.

The video of the encounter on the porch shows that two officers approach the door, an officer opens the screen door and knocks on the front door.  *See* Hr'g Ex. 2.  The defendant answers the door, partially closing the door behind him, and converses with the officers with a puzzled look on his face.  *Id.*  An officer, later determined to be Officer Lutter, states "Hello sir,

---

or 3 minutes before he entered.  *Id.* at 71.  He participated in the sweep and searched every room for spaces in which an individual could hide.  *Id.* at 70.  He stated he had no knowledge before he went in that there were people in the residence who were dangerous.  *Id.*

5

how are you doing today?  I'm investigator Richard Lutter, I'm an investigator with the Nebraska State Patrol, I got a couple quick questions, I'd like to talk to you, your neighbors are out, do you mind if we just step in and talk real quick?"  *Id.*  The defendant replies, "Um, I like to ask what it's about first."  During the exchange, the defendant glances several times at the screen-door handle/doorknob.  It is clear that the officer is standing at least partially inside the area of the partially open screen door.  The defendant repeatedly looks down at the open edge of the exterior door where the officer's foot or leg is inside the door.  Lutter responds:

> What it is it . . . We're conducting an investigation that's possible in related to the manufacturing of marijuana.  Okay, so I'd like to ask you a couple quick questions about it, if there nothing going on, there's no problems or anything like that, we're outta here, outta your hair, if we could just step in real quick.

Hr'g Ex. 2.

At that point, the defendant turns around, enters the home and the officer follows him closely behind.  *Id.*  The screen door is being held open by someone other than the defendant as he enters the house.  *Id.*  The officer is across the threshold of the house immediately behind the defendant and before the defendant can close the interior door.  The video shows the defendant turns his back to walk through the door with his right hand still on the knob of the interior door.  As he walks through the door the lead officer is directly behind him and across the threshold when the defendant looks back at him.  It is doubtful that the defendant could have closed the front door without using force against the armed officer's advance.  *Id.*

The exchange continues inside the house, with Lutter asking "Is anybody else home right now?"  *Id.*  The defendant replies, "Yes, my girlfriend is."  *Id.*  Lutter then states:  "Again, I'm going to be real straightforward with you here, stepping into the residence here there's a very strong smell of marijuana coming in the residence here, it's overwhelming," and informs the defendant that "because of the odor of the marijuana," he and the other officers were going to secure the residence and make sure no one else was there.  *Id.*  Lutter also told the defendant

6

he believed there was a marijuana grow operation in the house, was planning to apply for a search warrant, and was confident he could get one. *Id.* Lutter then read the defendant and his girlfriend their rights. *Id.*

The magistrate judge denied the defendant's motion to suppress, making findings on the record. Filing No. 31, Tr. at 123. The magistrate judge credited the testimony of the officers, but found the defendant's testimony less than credible. *See id.* at 119. He based the credibility assessment on his viewing of the video recording, stating that he would have taken the defendant's actions "as an invitation or impliedly allowing me to enter the home," noting that the defendant "steps back away, he goes in, he never says anything else, and Lutter follows in." *Id.* at 119. The magistrate judge further stated "[t]here's no objection when Lutter follows in, you shouldn't come in, why are you coming in. And so basically—And there's no evidence that Lutter in any way attempted to hold any door at any time, screen door or otherwise."[4] *Id.* The magistrate judge stated that the defendant's testimony "did not square" with the magistrate judge's viewing of the videotaped recording, in that he found the recording showed the defendant allowing the officers to enter. *Id.* at 123. He found no evidence that at any time "Lutter attempted to, in any way, stop the closing of any doors or not allow the Defendant to withdraw if that's what he wished." *Id.*

The magistrate judge also found that Officer Lutter had probable cause "based upon his prior information of his observances of the matters in the back of the pickup truck on June 24th and the later—the electronic—the electricity use of that building and his suspicion as a trained narcotics officer that this was the location of a marijuana grow operation." *Id.* at 119. He

---

[4] As noted above, this court's review of the video does not support that finding. The video shows that an officer held the screen door open. The magistrate judge discredited the defendant's testimony because he found "it didn't square" with the evidence of the encounter shown in the videotape. To the contrary, the court finds the defendant's testimony is consistent with what is shown on the video. The video shows that the screen door was held open by someone other than the defendant at the time of the entry and the officer was fully across the threshold before the defendant had a chance to turn around and close the door. The officer was between the defendant and the door immediately after the officer entered the house.

concluded that the "Government, actually, has met its burden of proving legitimately—legitimacy of the warrantless entry of the Government."[5]  *Id.* at 120.  He found the government had shown that the officers had the defendant's permission to enter the home.  *Id.*  In conclusion, the magistrate judge stated on the record:

> I'm just going to go through a quick summary of what I've determined, the smell of marijuana on the porch based upon Lutter's prior knowledge was, in fact, probable cause at that time.  That it certainly was after entry, which was done with the permission of the Defendant, at least implicitly, and that he was—his free will was not overborne by the activities of Officer Lutter.  That the smell of marijuana was present on the porch and in the home.  That the protective sweep was not necessary; however, that the search warrant would allow for that information to come in as evidence because there was probable cause just upon those items that I have previously set forth on the record.  And the inevitable discovery and the reliance of the officers on the search warrant.

*Id.* at 122.

The defendant objects to the magistrate judge's finding that the entry of the police officers into the defendant's home was consensual and to the magistrate judge's conclusion that, although the sweep search of the defendant's home was illegal, the evidence found in the sweep search was admissible because the officers had probable cause.

II.     Law

"At the [Fourth] Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"  *Florida v. Jardines*, ─── U.S. ───, 133 S. Ct. 1409, 1414 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)); *Mitchell v. Shearrer*, 729 F.3d 1070, 1076 (8th Cir. 2013) (noting that when a person is standing inside his home, the Constitution affords him the greatest measure of privacy).  The Supreme Court has "repeatedly held that 'searches conducted

---

[5] The magistrate judge cited *United States v. Parris*, 17 F.3d 227 (8th  Cir. 1994), in support of its conclusion.  That case involved both probable cause and exigent circumstances as well as a finding of voluntary consent based on the defendant's signing a consent form after having been informed of the right to refuse consent.  *Parris*, 17 F.3d at 229-30.  It has little applicability to this case.

outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'"   *City of Los Angeles v. Patel*, —- U.S. ——, ——, 135 S. Ct. 2443, 2452 (2015) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)); *see Johnson v. United States*, 333 U.S. 10, 14 (1948)("Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the [Fourth] Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.").

A warrantless search of a house is *per se* unreasonable.   *Payton v. New York*, 445 U.S. 573, 585-86 (1980) ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable").   "[T]he Fourth Amendment has drawn a firm line at the entrance to the house."   *Id.*; *see Fernandez v. California*, 134 S. Ct. 1126, 1128 (2014) ("[T]he physical entry of the home is the chief evil against which . . . the Fourth Amendment is directed." (internal quotation marks omitted)); *Jardines*, 133 S. Ct. 1409, 1418 (2013) (Kagan, J., concurring) (stating that a home is "the most private and inviolate (or so we expect) of all the places and things the Fourth Amendment protects").

 "[T]he area 'immediately surrounding and associated with the home'—what our cases call the curtilage—[is regarded] as 'part of the home itself for Fourth Amendment purposes.'"   *Jardines*, 133 S. Ct. at 1414 (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)) (also noting that Fourth Amendment protection "would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity.").   The Fourth Amendment protects not only residences against unreasonable searches and seizures, but also the curtilage surrounding the residence.   *United States v.*

9

*Bearden*, 780 F.3d 887, 893 (8th Cir. 2015); *see Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (police officers require "either a warrant or probable cause plus exigent circumstances in order to make a lawful entry" into a home or its curtilage).

However, "'[n]o Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways.'" *United States v. Wells*, 648 F.3d 671, 679 (8th Cir. 2011) (quoting *United States v. Reed*, 733 F.2d 492, 501 (8th Cir. 1984)).  "[An] implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines,* 133 S. Ct. at 1415; *see Wells*, 648 F.3d 671, 679 (8th Cir.  2011) (noting that "homeowners grant members of the visiting public—mail carriers, sanitation workers, neighbors, and Girl Scouts, to name a few—an implied consent to enter these areas for those purposes that accompany the normal interactions of a social, civilized society").  Law enforcement officers "not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Jardines*, 133 S. Ct. at 1416 (quoting *Kentucky v. King*, ——U.S. ——, 131 S. Ct. 1849, 1862 (2011)); *Wells*, 648 F.3d at 679 (stating that in what is known as a "knock and talk," law enforcement officers may enter the curtilage of a home for limited, legitimate law enforcement purposes, including to announce their presence and make inquiries).[6]  However, "the background

---

[6] The Eighth Circuit has affirmed on numerous occasions that the knock-and-talk procedure "is a consensual encounter under normal circumstances."  *United States v. Villa-Gonzalez*, 623 F.3d 526, 532 (8th Cir. 2010) (involving an encounter on the porch of a trailer); *see United States v. Spotted Elk*, 548 F.3d 641, 655 (8th Cir. 2008) (involving consent to enter a trailer to serve an arrest warrant).  "[I]t does not violate the Fourth Amendment merely to knock on a door without probable cause."  *Spotted Elk*, 548 F.3d at 655; *but see Wells*, 648 F.3d at 680 (refusing to extend the "knock-and-talk" rule where police exceeded scope of their implied invitation when they bypassed the front door and proceeded directly to the back yard).  "[A] police attempt to 'knock and talk' can become coercive if the police assert their authority, refuse to leave, or otherwise make the people inside feel they cannot refuse to open up."  *Spotted Elk*, 548 F.3d at 655; *see also United*

social norms that invite a visitor to the front door do not invite him there to conduct a search." *Jardines*, 133 S. Ct. at 1416 (noting that "[t]he scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose").

A Fourth Amendment "search" occurs "when the government gains evidence by physically intruding on constitutionally protected areas." *Jardines*, 133 S. Ct. at 1417; *see Grady v. North Carolina*, 135 S. Ct. 1368, 1369 (2015) (per curiam). It is clearly established that the Fourth Amendment prohibits a warrantless entry into a suspect's home to make a routine felony arrest absent consent or exigent circumstances. *Rogers v. Carter*, 133 F.3d 1114, 1118 (8th Cir. 1998); *Payton*, 445 U.S. at 588–90. Evidence recovered following an illegal entry of the home is inadmissible and must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 484–87 (1963).

"One 'jealously and carefully drawn' exception" to "the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable *per se*," "recognizes the validity of searches with the voluntary consent of an individual possessing authority[.]"[7] *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958)); *see also Jardines*, 133 S. Ct. at 1414; *Fernandez*, 134 S. Ct. at 1132 ("The owner of a home has a right to allow others to enter and examine the

---

*States v. Poe*, 462 F.3d 997, 1000 (8th Cir. 2006) (noting that "[a]lthough a person who opens a door in response to a simple knock by officers knowingly exposes to the public that which can be seen through the door, we have held that one who does so in response to a demand under color of authority does not open the door voluntarily" and finding no implied consent where defendant opened the door following over ten minutes of persistent knocks, officers were stationed at both doors to the residence and an officer had commanded the defendant to open the door).

[7] Another "exception to the warrant requirement permits an officer to enter a home if he or she acts with probable cause in the presence of exigent circumstances." *United States v. Schmidt*, 403 F.3d 1009, 1013 (8th Cir. 2005). The government has the burden of showing that exigent circumstances existed. *United States v. Clement*, 854 F.2d 1116, 1118 (8th Cir. 1988). Such exigencies include the need to render emergency aid to an injured occupant, hot pursuit of a fleeing suspect, and the need to prevent the destruction of evidence. *Kentucky v. King*, ——U.S. ——, 131 S. Ct. 1849, 1856 (2011). That exception is not at issue in this case.

premises, and there is no reason why the owner should not be permitted to extend this same privilege to police officers if that is the owner's choice.").

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *United States v. Aquino*, 674 F.3d 918, 923 (8th Cir. 2012); *United States v. Escobar*, 389 F.3d 781, 785 (8th Cir. 2004)("the government bears the burden of showing consent was freely and voluntary given and not a result of duress or coercion"). That burden is heaviest when consent would be inferred to enter and search a home, for protection of the privacy of the home "finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their . . . houses . . . shall not be violated.'" *Payton,* 445 U.S. at 589-90.

The burden to prove that such consent was:  1) actually given; and 2) freely and voluntarily given "cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper*, 391 U.S. at 548–549; *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990) (stating that the rule reflects elevated "[j]udicial concern to protect the sanctity of the home"); *United States v. Carter*, 378 F.3d 584, 589 (6th Cir. 2004) (en banc); *see id.*, 378 F.3d at 593 n.1 (Moore, J. dissenting) (noting that the fact "[t]hat *Bumper* dealt primarily with the second part of the inquiry—whether consent was voluntary when law enforcement officers asserted that they possessed a warrant—does not negate the applicability of the Supreme Court's general statement about acquiescence to cases assessing the threshold question of whether consent was even given in the first place").

"The question of whether a person expressed consent to a search is a question of fact, as is the question of whether such consent was voluntary." *United States v. Spotted Elk*, 548 F.3d 641, 650 (8th Cir. 2008).  "Voluntary consent may be express or implied."

*United States v. Lakoskey*, 462 F.3d 965, 973 (8th Cir. 2006); *Carter*, 378 F.3d at 587 ("Consent to a search 'may be in the form of words, gesture, or conduct'") (quoting *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir.1976)).  Unequivocal consent need not "always be verbally given or formally delivered."  *Carter*, 378 F.3d at 593-94 (Moore, J. dissenting) (noting that "[a] nod, a terse "okay" in response to a request to enter, or a hand gesture, may constitute unequivocal consent depending on the particular circumstances").[8] However, the burden to show voluntary consent "is heavier where consent is not explicit, since consent 'is not lightly to be inferred.'"  *United States v. Impink*, 728 F.2d 1228, 1232 (9th Cir. 1984) (quoting *United States v. Patacchia*, 602 F.2d 218, 219 (9th Cir. 1979)).

Consent may be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer.  *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007) (stating that "a defendant's consent must be clear, but it need not be verbal").  A court must first determine whether a defendant's actions could reasonably be interpreted to manifest consent to an officer's entry into his home or apartment, and once the existence of a consent by conduct is determined, its voluntariness must be examined.  *Griffin*, 530 F.2d at 743.

To determine whether consent was given voluntarily, courts examine the totality of the circumstances surrounding the consent.  *See Schneckloth v. Bustamonte,* 412 U.S. 218, 248-49 (1973) (noting that the test applied to determine if consent is free and voluntary

---

[8] "Even a spoken assent to search may be too ambiguous to establish consent in certain circumstances."  *Carter*, 378 F.3d at 589; *see, e.g., United States v. Worley*, 193 F.3d 380, 386 (6th Cir.1999) ("you've got the badge, I guess you can [search]" is not consent where context was intimidating and defendant testified that he felt he had no choice); *United States v. Weidul*, 325 F.3d 50, 53-54 (1st Cir. 2003) (consent not voluntary when resident said "okay" to officer informing her that he would be searching, though she did not protest search); *Escobar*, 389 F.3d at 785 ("Simply telling a police officer to '[g]o ahead' with a search is not, in and of itself, proof of voluntary consent").

is whether, in light of the totality of the circumstances, consent was given without coercion, express or implied); *Escobar*, 389 F.3d at 784-85.  Neither the presence nor the absence of any single criteria can be controlling in the determination.  *Schneckloth,* 412 U.S. at 226. Rather, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced." *Id.* at 233.

Whether consent is voluntarily given turns on a variety of factors, including a defendant's age, intelligence, and education; whether he cooperates with police; his knowledge of his right to refuse consent; and his familiarity with arrests and the legal system. *Escobar*, 389 F.3d at 785.  Also relevant is the environment in which consent was given and whether the police threatened, intimidated, punished, or falsely promised something to the defendant; whether the defendant was in custody or under arrest when consent was given and, if so, how long he had been detained; whether consent occurred in a public or secluded area, whether the suspect stood by silently as the search occurred, and whether the defendant's contemporaneous reaction to the search was consistent with consent. *Id.*; *United States v. Smith*, 260 F.3d 922, 924 (8th Cir. 2001).  "The factors should not be applied mechanically, and no single factor is dispositive or controlling." Escobar, 389 F.3d at 785 (quoting *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000))(internal citation omitted)).  "'The government must show that a reasonable person would have believed that the subject of a search gave consent that was the product of an essentially free and unconstrained choice, and that the subject comprehended the choice that he or she was making.'" *Escobar*, 389 F.3d at 784-85 (8th Cir. 2004) (quoting *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004)).

In the non-verbal context, a finding of implied consent generally requires overt body language, some affirmative act by defendant to indicate consent, or passive assent

following being informed of the right to refuse consent.  *See, e.g.*, *United States v. Smith*, 973 F.2d 1374, 1376 (8th Cir. 1992) (stepping aside and motioning officers to enter held to be implied consent);[9] *United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002) (implicit consent to enter trailer found based on testimony that the defendant's body language indicated that he yielded the right of way to the officers); *Carter*, 378 F.3d at 587 (stepping back and clearing a path for officers to enter a motel room found to be implied consent); *Impink*, 728 F.2d at 1233 n.3 (noting that "[i]n most implied consent cases, the suspect himself takes some action that implies consent-he gestures to the police to enter, or assists in the search of others" and refusing to infer consent from actions of a third party) (citations omitted)); *United States v. Garcia*, 997 F.2d 1273, 1281 (9th Cir. 1993) (holding that consent existed when defendant said "okay," nodded, and stepped back in response to officers' request to enter); *United States v. Rosi*, 27 F.3d 409, 412 (9th Cir. 1994) (consent to enter condominium implied because defendant provided agents with key so they could enter and defendant could change clothes); *United States v. Gordon*, 173 F.3d 761, 765-66 (10th Cir. 1999) (implied consent to search locked duffle bag found because defendant removed key from pocket and gave it to officer in response to question "[c]an you open that?");  *United States v. Peterson*, 100 F.3d 7, 11 (2d Cir. 1996) (implied consent found because defendant removed knapsack, handed it to officer, and later admitted giving officer permission to search); *United States v. Raibley*, 243 F.3d 1069, 1077 (7th Cir. 2001) (consent to view pornographic home movie voluntary because defendant first shrugged his shoulders in response to request for permission and later requested police view tape

---

[9] *But see* *United States v. Turbyfill*, 525 F.2d 57, 59 (8th Cir. 1975) (finding, pre-*Payton*, the action of opening the door and stepping back constituted an implied invitation to enter).  Notably, however, "*Payton v. New York* may have eroded the full force of *Turbyfill.*"  *United States v. Mahoney*, 712 F.2d 956, 961 (5th Cir. 1983).

privately); *United States v. Wesela*, 223 F.3d 656, 661 (7th Cir. 2000) (implicit consent found by actions of defendant's wife in calling police to home, not objecting to search as it occurred, and providing information to police while they searched); *Griffin*, 530 F.2d at 743 (finding implied consent shown by disparity in the defendant's two reactions: first responding "no" to a request to enter and slamming the door in the officers' faces, and later stepping back and leaving the door open without explicitly refusing to grant entry); *United States v. Mendenhall*, 446 U.S. 544, 557-60 (1980) (consent found when defendant began to undress after having been told she was free to withhold consent); *cf. United States v. Poe*, 462 F.3d 997, 1000 (8th Cir. 2006) (finding opening a door in response to persistent knocking by law enforcement is not implied consent); *United States v. Conner*, 127 F.3d 663, 666 (8th Cir. 1997) (acceding to a demand to "open up" is not implied consent to officers entry into a motel room).

However, consent cannot generally be inferred by a mere failure to object to the entry or search.  *See, e.g., United States v. Shaibu*, 920 F.2d 1423, 1425-27 (9th Cir. 1990)(deciding as a matter of law that the conduct of "merely retreating into one's home while being followed by a police officer," standing alone, is insufficient constitute consent to a police entry and finding consent not implied merely because defendant failed to object to officers entering apartment's open door); *United States v. Gonzalez*, 71 F.3d 819, 829-30 (11th Cir. 1996), *overruled on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009) (consent to enter could not be inferred where a woman refused an officer permission to enter and search her home, and rejecting the notion that "failure to object to a search equals consent to the search"); *United States v. Albrektsen*, 151 F.3d 951, 955 (9th Cir.1998) (suspect's moving aside to avoid physical contact with entering officers is insufficient to establish implied consent); *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012,

1017 (9th Cir. 2008) (finding the "the bare fact that [the defendant] neither refused to speak to [the officers] nor ordered them to leave after they pushed the door open and entered her home is insufficient to establish consent); *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323, 1329 (11th Cir. 2006) (consent cannot reasonably be inferred from a defendant's simple act of disengaging from conversation with a law enforcement officer and walking into the house, nor can consent reasonably be inferred from a defendant's failure to object once a law enforcement officer is inside); *United States v. McCraw*, 920 F.2d 224, 228 (4th Cir. 1990) (consent to officer's entry into hotel room not implied though defendant partially opened door to determine identity of persons knocking); *United States v. Waupekenay*, 973 F.2d 1533, 1535-36 (10th Cir. 1992) (coercion present in threat of arrest of wife precluded finding of implicit consent in requesting police assistance in removing abusive husband and failing to object when officers entered her trailer); *United States v. Little*, 431 Fed. App'x 417, 420–421 (6th Cir.2011) (no implied consent where officer "merely followed Defendant into the house when Defendant went in to get additional clothing"); *Roe v. Texas Dept. of Protective and Regulatory Services*, 299 F.3d 395, 402 (5th Cir. 2002) (stating that "[s]ilence or passivity cannot form the basis for consent to enter").[10]

"To permit the government to show consent to enter from the lack of an objection to the entry 'would be to justify entry by consent and consent by entry. This will not do.'" *Bashir,* 445 F.3d at 1329 (quoting *Gonzalez,* 71 F.3d at 830); s*ee Shaibu*, 920 F.2d at 1427-28 (stating "[w]e must not shift the burden from the government—to show 'unequivocal and

---

[10] Notably, in general, cases in which silence or a failure to object have been held to indicate implied consent involve searches of cars or containers, not entry into, or searches of, homes or residences. *See, e.g., United States v. Morales*, 861 F.2d 396, 399-400 (3d Cir. 1988) (consent implied because passenger lessee of rental car remained silent after driver consented and search occurred); *United States v. Dunkley*, 911 F.2d 522, 525-26 (11th Cir. 1990) (per curiam) (same); *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 667-70 (5th Cir. 2003) (consent implied because defendant did not object to agents' opening of sealed boxes inside trailer); *United States v. Patten*, 183 F.3d 1190, 1195 (10th Cir. 1999) (consent implied to search inside suitcase because defendant silently and without objection unzipped suitcase).

specific' consent—to the defendant, who would have to prove unequivocal and specific objection to a police entry, or be found to have given implied consent."); *Johnson*, 333 U.S. at 13.

> We do not expect others to walk in to our homes, even if the door is open, without first requesting permission to enter. That the police would so enter, without request, creates an impression of authority to do so . . . "[c]oercion is implicit in situations where consent is obtained under color of the badge."

*Shaibu*, 920 F.3d at 1428 (quoting *United States v. Page*, 302 F.2d 81, 84 (9th Cir. 1962)).

The failure to object to a police officer's "thrusting himself into [a defendant's apartment] more likely suggests "submission to authority than implied or voluntary consent." *Shaibu*, 920 F.3d at 1428; *see Johnson,* 333 U.S. at 13.  Such submission is not effective consent.  *Shaibu*, 920 F.3d at 1428; *see e.g.*, *United States v. Weidul*, 325 F.3d 50, 54 (1st Cir. 2003) (uttering "okay" to a statement that an officer was about to search a room was no consent to search but simple acquiescence to conduct tantamount to a claim of lawful authority to search); *United States v. Morales*, 171 F.3d 978, 983 (5th Cir. 1999) (consent to search warehouse not voluntary when four officers with drawn weapons banged on door, yelled "open up," and ordered suspects to floor); *United States v. Jones*, 846 F.2d 358, 360-61 (6th Cir. 1988) (per curiam) (consent to search home following coercive traffic stop and questioning without Miranda warnings found not voluntary where an illiterate, uneducated defendant cooperated only because he thought he was under arrest); *United States v. Tovar-Rico*, 61 F.3d 1529, 1535-36 (11th Cir. 1995) (consent to search apartment not voluntary when five officers knocked loudly and entered apartment quickly with guns drawn).

III.    DISCUSSION

The court respectively disagrees with the magistrate judge's conclusion that the defendant's motion to suppress should be denied.  The government relies on consent to justify the entry into the defendant's home and the subsequent search thereof.[11]  This court's review of the videotaped encounter with the police does not support the finding that the defendant consented to the officers' entry into his home, either explicitly or impliedly.  The defendant's statements, gestures, and body language indicate nothing more than acquiescence to lawful authority.  There is no dispute that the defendant did not explicitly consent to the officers' entry or invite them in.  The court finds the actions and statements shown on the video are not conduct from which this court can infer knowing and voluntary consent.  Accordingly, the government has not sustained its burden to show that a valid exception to the warrant requirement applies.  Even if the conduct could be construed as consent in the first place, the government has not shown that the consent was knowing and voluntary.

The evidence shows that when the defendant opened the door, he saw two police officers on his porch, and one near his window.  There were two more officers nearby, at least one of whom can be seen in the video wearing a tactical jacket.  The officers identified themselves and asked to enter.  The defendant did not give verbal or spoken consent.  The videotape shows only that, after hearing the officer's cursory explanation, the defendant turned and walked into his home.  Before he could close the door behind him, the lead officer is across the threshold and inside his home.

---

[11] In light of the court's disposition, the government's other arguments in opposition to the defendant's motion to suppress—that  safety concerns necessitated the protective sweep, that the evidence known to officers prior to the protective sweep established probable cause, and that the officers acted in good faith in executing the search warrant, *see* Filing No. 21, Government Brief at 3-11, are either irrelevant or are dependent on the initial finding of consent and need not be addressed.

The officers freely admit that they followed the defendant into his home. They had explicitly asked for permission and no explicit permission was given. The video does not show the sort of gestures by the defendant such as clearing a path, yielding the right of way, or motioning for someone to enter that would clearly and unequivocally show unspoken consent. The only possible signal of consent is the defendant's act of stepping back into his house. He did not back into his house, hold the door open for the officers, or gesture for them to follow him, but turned his back to the officers and walked in. He did not say anything while he retreated, such as "okay," "fine," or "come in" after the police asked to enter the house. Nor did he nod his head or gesture so as to indicate any affirmative response to the officer's request. In fact, the court finds he expressed what could be characterized as dismay and resignation when he turned to find the officers had already crossed the threshold into his house. Because the officers were already in the house by the time he turned around, the defendant did not have any opportunity to shut the front door on the officers. The defendant's conduct shows only acquiescence to authority, which is not enough, standing alone, to demonstrate consent. Under these circumstances, the defendant's silence cannot equal consent. Rodriguez simply stepped into his home and did not say a word to the officers, one of whom testified that his intent in the encounter was to get into the house to sniff for himself.

Further, it is undisputed that the defendant was not informed that he was free to refuse to allow the officers to enter the home or to terminate the encounter. Although the officers were not aggressive or belligerent, Officer Lutter's statements and demeanor was insistent and aggressive. His actions would lead a reasonable person to believe that compliance with his request was required. A showing that the defendant did not slam the door on the officers does not satisfy the government's burden of proving by a

preponderance of evidence that the defendant freely and voluntarily consented to the officers entering his home.

Also, Officer Lutter admitted that his intent was to gain entry to the home to "sniff for himself," and the defendant was detained immediately upon entry.   Lutter testified the detention was premised on the overwhelming smell of marijuana.   Even assuming the truth of Officer Lutter's testimony, detecting the overwhelming smell of marijuana after he had entered the house does not provide justification for entering the house in the first place. The officer's entry into the house without permission is itself a warrantless search, just as a drug dog's sniffing the curtilage is a search.   *See, e.g., Jardines*, 133 S. Ct. at 1417 (stating "[t]hat the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.").

Officers Lutter and Wineinger both admitted that they detected only a slight smell of marijuana prior to entering the home.   Although the slight smell of marijuana would have provided support for a search warrant, grounds for a citation, or support for an arrest warrant, it does not justify a warrantless entry into, or search of, the defendant's home. Possession of marijuana in Nebraska is an infraction, for which a person may be ticketed, but not arrested in his home.[12]   Officer Lutter further conceded the he had no probable

---

[12] *See* Neb. Rev. Stat. § 28-146 (13)(a)-(c)(providing that for the first offense of possession of less than an ounce of marijuana, a person is guilty of an infraction, receives a citation, and can be fined three hundred dollars).   "'[I]f an officer smells the odor of marijuana in circumstances where the officer can localize its source to a person, the officer has probable cause to believe that the person has committed or is committing the crime of possession of marijuana' and thus has 'authority to arrest him without a warrant *in a public place*'" (emphasis added).   *United States v. Perdoma*, 621 F.3d 745, 749 (8th Cir. 2010) (quoting *United States v. Humphries*, 372 F.3d 653, 659–60 (4th Cir. 2004)).   "Whether the offense was an infraction or a misdemeanor is irrelevant, however, because "'if an arrest is otherwise reasonable, the fact that it is not for an "arrestable" offense [under state law] does not make it unconstitutional.'"   *See United States v. Burtton*, 599 F.3d 823, 830 (8th Cir. 2010) (quoting *Thomas v. City of Peoria*, 580 F.3d 633, 637 (7th Cir. 2009); *see also Virginia v. Moore*, 553 U.S. 164, 176, 128 S. Ct. 1598, 170 L.Ed.2d 559 (2008) ("We conclude that warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States

cause to search the house, even though the defendant had previously smelled of marijuana during a recent traffic stop.  The apparent assumption that the smell of marijuana during the traffic stop did not support a search of the defendant's vehicle, or provide the probable cause to obtain a search warrant for his home, but for the purpose of a "knock and talk," the odor would support a warrantless search of the defendant's home defies logic.

The court finds the government has not sustained its burden of showing that the defendant freely and voluntarily consented to the officers' entry into his house.  It is undisputed that the defendant was not told that he had the right to refuse consent.  The defendant was confronted on his front porch by more than one armed officer.  Once the defendant answered the door, Officer Lutter positioned himself inside the exterior door.  The defendant could not close the exterior door after it was opened.  The defendant's familiarity with the legal system included only minor charges.  Officer Lutter informed the defendant at the outset that he was the focus of an investigation.  Lutter admits that he went to the house with the intention of going inside and did not have enough evidence to obtain a warrant.

---

are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections.").

Under Nebraska law, "a police officer may arrest for a misdemeanor committed or attempted in his presence." *State v. Reeder*, 160 N.W.2d 753, 756-57 (1968).  Also, "[a] peace officer may arrest a person without a warrant if the officer has reasonable cause to believe that such person has committed: (1) A felony . . . ." Neb. Rev. Stat. § 29-404.  However, "[s]ince the United States Supreme Court's decision in *Payton*, absent exigent circumstances, the police may not make a warrantless and nonconsensual entry into a suspect's home in order to make a felony arrest, regardless of the officer's reasonable belief." *State v. Schlothauer*, 294 N.W.2d 382, 384 (Neb. 1980).  A warrantless and nonconsensual arrest in the defendant's home for such an infraction is prohibited under the Fourth Amendment absent exigent circumstances. *Id*.  In *Welsh v. Wisconsin*, 466 U.S. 740, 742 (1984), the Supreme Court addressed the circumstances under which the Fourth Amendment prohibits police from making a warrantless arrest.  The Court held that the reasonableness of such an arrest is to be determined in light of the state's assessment of the gravity of the offense justifying the arrest, as expressed by the state's classification of the offense. *Id*. at 753–754 (stating that "[o]ur hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue, is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor").

Lutter testified that immediately upon entry into the house, the officers told the defendant he was being detained.

This evidence supports the court's conclusion that the officers had decided not to go through the effort or risk of obtaining a search warrant from an impartial magistrate.   The Supreme Court has held that the use of a drug dog to sniff the curtilage of a house does not justify a warrantless search.   In the instant case, Officer Lutter admits the officers, suspecting marijuana in the house, went to the front porch to get a "scent" that would provide probable cause to search.   The government effectively invites the court to treat a residence the same as a vehicle in that scent of marijuana alone can tip the probable cause scale to justify a warrantless search.   In light of the exalted position of the home in the Fourth Amendment context, the court finds extension of vehicle-search principles to a residence is not appropriate. [13]

---

[13] Odor alone does not justify a warrantless search of a home.  *See Taylor v. United States*, 286 U.S. 1, 6 (1932) (Odors alone do not authorize the search of a home without a warrant, although they may justify issuance of a search warrant); *Johnson*, 333 U.S. at 16 ("When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent").   In the Eighth Circuit, the smell of marijuana, along with the credible testimony by the officer, is sufficient to establish probable cause to search an automobile and its contents.  *United States v. Smith*, No. 14-2846, 2015 WL 3797623, at *4 (8th Cir. June 19, 2015).  Also, testimony that a defendant smelled strongly of marijuana, regardless of the place the officer encounters the defendant, supports a probable cause determination in the context of a search warrant.  *United States v. Turner*, 431 F.3d 332, 337 (8th Cir. 2005). The smell of methamphetamine and discovery of methamphetamine lab components, together with knowledge of the well-documented potential hazards of methamphetamine manufacture, provide the exigent circumstance of an emergency situation with a legitimate concern for the safety of individuals.  *Collins v. Edwards*, 131 Fed. App'x 72, 73-74 (8th Cir. 2005).

However, these cases do not stand for the proposition that the plain view doctrine extends to a "plain smell" doctrine in the context of a home or residence.   "[P]plain view" provides grounds for seizure of an item when an officer's access to an object has some prior justification under the Fourth Amendment."  *Texas v. Brown*, 460 U.S. 730, 738 (1983).   The "plain view" doctrine is best understood "not as an independent exception to the warrant clause, but simply as an extension of whatever the prior justification for an officer's access to an object may be."  *Id.* at 738–39.   The main consideration in applying either the plain view or plain smell doctrine is to determine whether the observing officer has a right to be in a position to have that view or smell.  *See, e.g., Harris v. United States*, 390 U.S. 234, 236 (1968); *United States v. Davis*, 423 F.2d 974, 977 (5th Cir. 1970)).   So understood, courts have logically extended this concept to permit the admission of evidence discovered with other sensory faculties.  *See, e.g., United States v. Angelos*, 433 F.3d 738, 747 (10th Cir. 2006) ("plain smell"); *United States v. Clayton*, 210 F.3d 841, 845 (8th Cir. 2000) (concluding that officer

Absent consent, the warrantless search of a home must be justified by both probable cause and exigent circumstances.  Officer Lutter testified that the officers did not have sufficient probable cause to believe they would discover evidence of a crime in the defendant's home to obtain a search warrant at the moment he knocked on the door.  The government has not propounded any exigent circumstances.

Consistent with Supreme Court case law, the officers may have had a license or implied invitation to approach the front door, knock, and ask to talk, but they exceeded the scope of that invitation when they, by their own admission, simply followed the defendant into his home.  It is undisputed that the defendant did not explicitly consent to the officers' entry, and the court finds the government has not presented evidence to show implied consent.  In light of the totality of the circumstances, any belief that the defendant gave consent that was an "essentially free and unrestrained choice" was not reasonable.  The government has not met its burden to show that Rodriguez voluntarily consented to the entry and search.  Accordingly, the court finds the government has not sustained its burden to show the presumptively unreasonable seizure of the defendant in his home or the presumptively unreasonable search of the defendant's home is justified.[14]  Accordingly,

---

executing arrest warrant "quickly developed probable cause for a search based on his immediate perception of an odor associated with methamphetamine production").  The exigencies that justify automobile searches are distinct from those that justify a warrantless search of a home.  *See Davis, 423 F.2d at 977* (observing that the plain view and plain smell doctrines lend themselves to application in cases involving evidence recovered from automobiles located in public places "because the observing officer is not required to trespass on private property in order to have a clear view (or smell) of articles inside an automobile.").

[14] In light of this determination, the "protective sweep" issue is irrelevant.  The court notes, however, that the government presented no evidence of danger or of imminent destruction of evidence.  The court agrees with the magistrate judge's conclusion that the government failed to demonstrate a need for a protective sweep of the house.  The officers admitted they had no knowledge of dangerous individuals in the house.  They had not observed people coming and going from the house and were aware that only the defendant and his wife lived there.  There is a qualitative difference between 20 marijuana plants and the accoutrements—grow lights, vents, fans, etc.—that accompany a "grow operation" and baggies of illicit drugs that can easily be flushed down a toilet.

IT IS ORDERED:

1.      The defendant's objection (Filing No. 30), to the findings and recommendation of the magistrate judge (Filing No. 26) is sustained.

2.      The Findings and Recommendation of the magistrate judge (Filing No. 26) will not be adopted.

3.      The defendant's motion to suppress (Filing No. 13) is granted.

DATED this 28th day of July, 2015.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge

---

Similarly, the court need not address the "inevitable discovery" issue.  The admissibility of the evidence found in the subsequent search is fruit of the poisonous tree under *Wong Sun.*  The government has not argued that anything purges the taint of the initial illegal entry so as to prevent exclusion of the evidence, nor has it shown any reasonable probability the evidence would have been discovered by lawful means in the absence of police misconduct.

The issue of whether the officers could have presented probable cause for a search warrant without the evidence they illegally obtained is a red herring.  If there were evidence sufficient to support a magistrate's disinterested determination to issue a search warrant, the officers should have gotten a warrant.  *See Johnson v. United States*, 333 U.S. at 14 (stating that "[w]hen the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent").  Professing that they could have, but didn't, will not justify a search without a warrant or the Fourth Amendment would be reduced to a nullity.  *See id.* (noting that the "inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate . . . are never very convincing reasons and, in these circumstances, certainly are not enough to bypass the constitutional requirement").